# DAVID WATKINS HARKER *v.* STATE OF MARYLAND

[No. 1608, September Term, 1982.]

*Decided July 14, 1983.*

The cause was argued before GARRITY and BLOOM, JJ., and FREDERICK A. THAYER III, Associate Judge of the Fourth Judicial Circuit, specially assigned.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Richard B. Rosenblatt, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Joseph I. Cassilly, State's Attorney for Harford County,* and *John L. Dunnigan, Assistant State's Attorney for Harford County,* on the brief, for appellee.

BLOOM, J., delivered the opinion of the Court.

David Watkins Harker, appellant, was convicted by a jury in the Circuit Court for Harford County (Close, J.) of assault with intent to murder and received a thirty year sentence. On this appeal appellant contends:

> I. The trial judge erred in denying appellant's motion to suppress the extrajudicial and in-court identifications of appellant.

II.  The trial judge erred in permitting a jailhouse informant to testify.

III.  The trial judge abused his discretion in denying appellant's motion for a new trial.

*Facts*

Mervyn Graham Thompson, a management assistant with the Harford County Department of Planning and Zoning, attended a concert on the evening of December 7, 1980. When he returned home that night, his daughter-in-law informed him that a man had called at the house to inquire about an old truck. Shortly thereafter, Thompson received a telephone call from a "Mr. Palmer," who told Thompson that his (Palmer's) son had cut his hand on Thompson's truck, indicating that the boy may have damaged the truck. Palmer said he wanted to pay for any damage done by his son and asked Thompson to examine the truck with him. Thompson agreed to meet him.

Thompson's daughter-in-law drove him down the driveway to where Palmer's car was parked. Palmer and Thompson examined the truck but could find no evidence of recent damage. At that point, Thompson's daughter-in-law drove off. Palmer then asked Thompson to help him look for his glove; but after they looked for awhile, Palmer jumped into his car and, from inside the car, pointed a shotgun at Thompson. Thompson instinctively threw his flashlight at Palmer and ran. After running for about twenty yards, Thompson turned in time to see Palmer leaning against a light pole, taking aim at him with the shotgun. Palmer said, "You son of a bitch," and started firing.

Three shots were fired at Thompson. The first shot hit him in the left arm and side, knocking him down. The second shot grazed his head while he was in a kneeling position. The third shot apparently missed him. At that moment Thompson remembered he had a pistol with him and starting shooting at Palmer. Thompson fired four shots before Palmer got into his car and drove off. Then Thompson

managed to get back to his house and summons help. His left arm had been so badly mangled by the first shot that it had to be amputated.

On December 10, Thompson was interviewed by Deputy Sheriff David Saneman. Thompson initially described his assailant as "a white male, approximately six foot two in height, medium dark to dark brown hair, medium build, thirty five to forty years of age, wearing a flannel shirt over a regular shirt." He described the assailant's car as "a red Honda four door with either red velour or vinyl interior, with a maroon print." With Thompson's assistance, Saneman prepared a composite sketch of the assailant.[1]

On December 22, 1980, Trooper First Class Mark H. Ward of the Maryland State Police observed a red Honda Accord four door sedan being driven by a man who bore a strong resemblance to the composite sketch, which Ward had seen several days earlier. Because of that resemblance and the similarity between the vehicle he observed and the description of the automobile which accompanied the composite sketch, Trooper Ward noted the license tag number, which he subsequently ran through the computer. The vehicle observed by Trooper Ward was registered to one David Watkins Harker, 1812 Blakefield Circle, Lutherville, Maryland. The physical description of the owner was "white male, six one, two hundred pounds, date of birth 8/25/44." The automobile was listed as a 1976 Honda two door sedan. Trooper Ward informed the Harford County Sheriff's Department of his observations and findings.

Deputy Sheriff Jordon V. Watts, Jr., upon receipt of the information furnished by Trooper Ward, went to 1812 Blakefield Circle, Lutherville, and talked to David Harker, Sr., who advised that his son owned a red Honda automobile. When shown a copy of the composite sketch, Mr. Harker stated that it was similar to his son's appearance.[2]

---

1. Thompson indicated that he was satisfied that the composite was a fair representation of his assailant's appearance except for the hair. Saneman's kit from which he made the composite did not contain any elements which accurately depicted the assailant's hair style as Thompson described it.

2. The testimony by Deputy Sheriff Watts as to his conversation with

One aspect of the victim's story puzzled the investigating officers. Thompson's recollection was that he was standing near the back of his truck when he was shot, but physical evidence at the scene tended to indicate that he must have been standing at the front of the truck. In an effort to clarify the apparent discrepancy and, hopefully, obtain the license number of the red Honda, the investigating police officers suggested to Thompson that he be hypnotized. Thompson agreed and was taken to Montgomery County to be hypnotized by Lieutenant James Roby of the Montgomery County Police Department. Lt. Roby was assisted by Sergeant Lloyd White of the Maryland State Police. During the hypnotic session, Thompson was asked to recall the events of December 7, 1980.[3]

Under hypnosis, Thompson could not recall the license number of the red Honda, but did give the following description of his assailant:

> Merv (Thompson): Just a stocky build, but not heavy, not slender, but not heavy, and he's got his hair just styled. It was over on the side of his head, you know he didn't have any sideburns, long sideburns, no moustache, or beard. He had light to medium brown hair. And his glasses were something like mine only they had light gold rims around them. He had on sort of a brown wool type shirt over top of another shirt that he had on as I recall just a colored shirt you couldn't see much of that except the collar and I remember . . . shirt with

Harker, Sr., was adduced at a pretrial hearing before Judge Close on a motion to suppress certain evidence. Watts did not reiterate this conversation when he testified before the jury during the trial.

**3.** Sgt. White attempted to videotape the hypnotic session, but unsuccessfully. There was, however, an audio tape of the session which was played for the jury at the trial, and a transcript of the audio tape was introduced in evidence over appellant's objection. Because certain small portions of the audio tape were unintelligible, there were gaps in the transcript.

the coattail hanging out you know, not down in the trousers, just hanging out like a jacket, just a mild night, he had on just a pair of slacks, just dress slacks, not jeans or anything rough like that, just dress slacks, I think they were maybe tan, dark, dark in color, dark brown or something matching that. To me that flannel shirt was a sort of a medium tan, maybe a little plaider, like plaid, not plaid to be noticeable that it wasn't plaid.

Roby: (Inaudible) general look closely, is there anything.

Merv: I see a fairly nice looking man, he is not rough looking, he's not a hard looking guy, he looks like a guy that would have a nice clean car (inaudible).

Roby: Do you think you would recognize his face?

Merv: Yes, Yes I would, yes (extreme emotion). I'd do anything if I could only see him . . . I've gone through . . . I'd never forget it as long as God gives me memory!!

Roby: Just relax.

Merv: I'd never forget it if he doesn't change, but he would change wouldn't he? He would change his hair style, he would change everything. I would.

Roby: I want you to relax, look on the screen, . . . what do you see now?

Merv: He's an average build man.

Roby: Just look at screen, nothing is going to happen to you. Just relax.

Merv: He's 180 or 190 pound man, nice seems to be (inaudible). Seems to be well built.

Roby: Now, lowering the camera, farther down what do you see now?

Merv: I see the trousers and his legs. Dress shoes even, just brown dress shoes.

Roby: Describe the shoes.

Merv: I don't think they're boots, they're not fancy boots. I don't remember anything like that.

Roby: (Inaudible) allow yourself to look and anything else that you see.

Merv: I don't know what to say, he just seemed like a pretty ordinary sort of a guy, who most likely, looked like a person that could get, I mean a man that would actually have interest in his child.

Four days after the hypnotic session, Thompson was shown an array of photographs and was told by Deputy Saneman that the picture of the man who shot him might or might not be included in the group of ten photographs. Thompson selected appellant's photograph as possibly that of the man who shot him but wanted to get a look at him in person. He felt the photograph strongly resembled his assailant except for the hair style.

On February 10, 1981, Thompson was escorted to the County Courts Building in Towson, assigned a vantage point in a corridor and told to observe the people in the courthouse because the man who shot him might or might not pass by. Some forty minutes later, appellant walked down the hallway and into a courtroom. He was dressed in a three piece blue suit and camel hair topcoat. Thompson said appellant looked like his assailant, but he wanted to get a better look at his face. Later that morning, appellant walked out of the courtroom and stopped in front of Thompson who at that time was able to make a positive identification of appellant as the man who shot him.

Appellant moved to suppress any in-court identification by Thompson on the grounds that it had been "tainted" by hypnosis. He also moved to suppress the identification made by Thompson at the photographic line-up and as a result of the confrontation at the County Courts Building in Towson. The motions were denied.

At trial, Thompson identified appellant as his assailant, stating: "Believing that on the final day God will be my

judge and all the Saints my jury, there stands the man who tried to murder me."

Appellant had driven his automobile to California and, while there, sold it. Photographs of the vehicle, a red, four door Honda Accord, were admitted into evidence by stipulation.

The State's final witness was one Larry Eley who met appellant at the Harford County Detention Center where Eley was incarcerated pending trial on several charges of theft. Eley testified that appellant told him "he shot [the zoning man's] arm off but meant to shoot him in the heart." Eley further testified that appellant hinted that if he (Eley) could get out of jail on bond he could earn about five thousand dollars by killing Thompson, mentioning the name of a man to see about earning the money.[4]

Appellant testified in his own defense, denied shooting Thompson and presented an alibi defense which was corroborated by his parents and two friends.

Appellant was convicted of assault with intent to murder; his motion for a new trial was denied; and this appeal was timely taken.

## I. *Suppression of Identification*

### A. *Hypnotically Induced Description*

Appellant's first attack upon the extrajudicial and in-court identifications of him by the victim is an assertion that those identifications were "tainted by hypnosis."

In *Harding v. State,* 5 Md. App. 230 (1968), *cert. denied,* 395 U.S. 949 (1969), our first reported decision concerning the admissibility of hypnotically induced testimony of a prosecuting witness, we held that such testimony was admissible and that the effect of hypnosis upon the recollection of the witness affected only the weight of the

---

4. The name mentioned was that of one of the persons Thompson believed had a motive to kill him.

evidence. In *State v. Temoney,* 45 Md. App. 569 (1980), *vacated on other grounds,* 290 Md. 251, relying on *Harding, supra,* we again held that hypnotically induced testimony was admissible. A number of jurisdictions similarly ruled that pretrial hypnotism raises questions as to the weight and credibility, rather than the admissibility, of the evidence. *See United States v. Adams,* 581 F.2d 193, 198 (9th Cir. 1978), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621 (1978); *United States v. Narciso,* 446 F.Supp. 252, 284 (E.D. Mich. 1977); *Creamer v. State,* 232 Ga. 136, 138, 205 S.E.2d 240, 242 (1974); *People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848, 853 (1979); *State v. Jorgensen,* 8 Or. App. 1, 9, 492 P.2d 312, 315 (1971). *But see Greenfield v. Commonwealth,* 214 Va. 710, 204 S.E.2d 414 (1974). In some cases, the use of hypnotism was deemed analogous to the use of a document shown to a witness at trial to refresh his or her recollection. *Kline v. Ford Motor Co., Inc.,* 523 F.2d 1067 (9th Cir. 1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506, 509 (9th Cir. 1974).

After *Harding,* in *Reed v. State,* 283 Md. 374 (1978), a case involving the use of testimony based on spectrographs ("voiceprints"), the Court of Appeals first adopted the now familiar "general acceptance rule" enunciated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). As stated in *Reed,* the *Frye* test, initially used in the context of a lie detector examination but applicable to various newly developed methods of scientific discovery, mandates that:

> "[B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field." *Reed, supra,* 283 Md. at 381.

This Court, speaking through Judge Moore in *Polk v. State,* 48 Md. App. 382 (1982), determined that the *Frye* test is applicable to this technique of memory retrieval, even though the testimony resulting from it involves neither the use of scientific equipment nor the expression of an opinion

by an expert. We noted there that Minnesota and Arizona had considered the issue and applied *Frye* to hypnotically induced testimony. The Supreme Court of Minnesota, in *State v. Mack,* 292 N.W.2d 764 (Minn. 1980), and the Supreme Court of Arizona, in *State v. Mena,* 624 P.2d 1274 (Ariz. 1981), held that a witness whose memory has been "revived" by hypnosis may not be permitted to testify in a criminal proceeding as to matters which he or she "remembers" under hypnosis. The rationale of both decisions, of course, is that the results of hypnosis are not scientifically reliable as accurate and that cross-examination to test the reliability of testimony may well be ineffectual with respect to hypnotically induced or enhanced testimony.

In accord with these decisions, this Court reversed Polk's conviction and remanded the case for a new trial at which a determination would be made on the general acceptability of hypnosis in the relevant scientific community. The substance of a memory refreshed by hypnosis could be admitted into testimony only if the general acceptability test was satisfied, the hypnosis was properly conducted by a qualified examiner, and the jury was apprised of the use of hypnosis.

Then, in *Collins v. State,* 52 Md. App. 186, *cert. granted,* 294 Md. 597 (1982), for the first time, upon a full evidentiary record and after a full analysis of the treatises and case law, this Court ruled that there was not general scientific acceptance of the technique's reliability. To the extent that prior cases in this jurisdiction had permitted the admission of hypnotically induced testimony, those cases were overruled.

There does seem to be, however, general agreement that hypnosis can be an extremely useful investigating tool. As Judge Liss noted for the court in *Collins,* the Minnesota Supreme Court in *Mack* found no reason why hypnosis could not continue to be used to enable a subject to remember verifiable factual information that could provide leads for further investigation, so long as the material remembered during hypnosis was not later used in court as part of an eyewitness' testimony. 292 N.W.2d at 768. The Arizona

Supreme Court, in *Collins v. Superior Court of State of Arizona,* 132 Ariz. 180, 644 P.2d 1266 (1982), and the California Supreme Court, in *People v. Shirley,* 181 Cal. Rptr. 243, 641 P.2d 775 (1982), likewise declined to foreclose the use of hypnosis by the police for purely investigative purposes.

This case was tried after *Polk* was decided but before our decision in *Collins* was filed. In denying appellant's motion to suppress the extrajudicial and the anticipated in-court identification to be made by the victim, the court was governed by *Polk* and, in accordance therewith, made an express determination that hypnosis is now generally acceptable in the relevant scientific community as reliable for the purpose of memory retrieval. That determination became invalid as a result of *Collins.*

The court made other findings, as required by *Polk,* which enable us to conclude that despite the hypnotic session the victim's extrajudicial and in-court identifications of appellant as the assailant were reliable products of pre-hypnosis memory, untainted by hypnosis. It found that the hypnotist, professionally qualified to administer the hypnosis, was objective in the application of the technique, did not suggest the responses to be made by the subject, and made no post-hypnotic suggestion. Specifically the court found as a matter of fact that the hypnosis session had no effect on the victim's ability to identify the appellant as his assailant; that hypnosis did not "taint" the photographic identification or the identification at the Baltimore County Courts Building; and that the hypnotic session would not impair defense counsel's ability to cross-examine the victim because the manner in which Thompson made the photographic and confrontational identifications (not positive as to the photograph; hesitant at the confrontation) indicated that he retained critical judgment, unimpaired by the hypnosis.

Our examination of the record persuades us that these findings are correct. There was no substantial variation in Thompson's descriptions of his assailant before, during and after hypnosis. Of even more significance was his ability,

prior to hypnosis, to produce a composite sketch which, except for the hair style, greatly resembled the photograph of appellant and which was sufficiently like appellant's countenance that Trooper Ward and appellant's father were able to see the resemblance. It is clear, therefore, that Thompson's ability to identify appellant was not hypnotically induced evidence which would have to be excluded under *Collins*. Nor was the identification "tainted" by hypnosis in the sense of suggestiveness or other improper techniques. In this respect, it would obviously have been better to have a video tape of the hypnosis session than an audio tape with some unintelligible gaps in it. Nevertheless, a transcript of the audio tape and the testimony of those who were present during the hypnosis session, as well as the manner in which Thompson made the extrajudicial identifications justify the trial court's determination that there was no improper suggestiveness to impair the victim's critical judgment.

Appellant's second attack upon the victim's identification of him as the assailant is that it should have been suppressed because of an impermissibly suggestive photographic array and an impermissibly suggestive confrontation in the Baltimore County Courthouse.

### B. Photographic Identification

Appellant asserts that the photographic lineup and subsequent showup were "so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification," *Simmons v. United States,* 390 U.S. 377, 384 (1968). For support he cites *Simmons* and *Stovall v. Denno,* 388 U.S. 293 (1967), for the proposition that identification of an accused, whether extrajudicial or in court, must comport with due process requirements; *Smith and Samuels v. State,* 6 Md. App. 59 (1969), as establishing the procedure to be followed when identification evidence is challenged; and *Manson v. Brathwaite,* 432 U.S. 98 (1977), *Rustin v. State,* 46 Md. App. 28 (1980), and *Adams v. State,* 43 Md.

App. 528 (1979), for the proposition that once it is shown that there were impermissibly suggestive identification procedures, an in-court identification based on those procedures is allowable only if it can be shown that positive factors of reliability outweigh the corrupting effect of the suggestive procedures.

In accordance with *Smith and Samuels v. State, supra,* the trial court conducted a hearing out of the presence of the jury and concluded that there was no impermissive suggestiveness. We agree.

With respect to the photographic array, appellant concedes that the array was unremarkable in all respects except that appellant's photograph was the only one showing a subject wearing "a plaid flannel shirt over another shirt." That single factor, appellant contends, made the photographic array impermissibly suggestive because Thompson, while under hypnosis, had so described the clothing worn by his assailant on the night of the shooting. Our examination of the photographs, however, discloses that although appellant's shirt is definitely a bold plaid, it is worn over a white tee shirt and not another colored shirt with a collar as Thompson described under hypnosis, nor does the bold plaid on the photograph quite match the description "a sort of a medium tan, maybe a little plaider, like plaid, not plaid to be noticeable it wasn't plaid." There was one photograph in the array of a subject rather similar in appearance to appellant, wearing what appears to be a flannel or velour shirt over another shirt, dark in color, with a collar. Moreover, according to the testimony of Deputy Saneman, Thompson's comments upon selecting appellant's photograph were directed to the facial features and the glasses, which matched the assailant's, and to the hairstyle, which did not.

## C. Confrontation

Appellant next complains that the Baltimore County Courthouse confrontation was suggestive in that appellant was the only person in the photo array to appear at the courthouse that day. The evidence concerning the confrontation at the courthouse, however, reflected no suggestiveness. Thompson was not told his assailant would be there, only that he might be. There were many people, variously dressed, passing by Mr. Thompson in the corridor. Appellant, on that occasion, was dressed in a three piece suit and camel hair topcoat. When Thompson first saw appellant that day, he was not positive; he had to get a second look at appellant's face before he was sure of the identification.

Considering the opportunity for Thompson to have observed his assailant on the night of the crime, his heightened state of attention and awareness during the assault, and the accuracy of his description of the assailant, it is abundantly clear that the extrajudicial identifications were not the products of procedural suggestiveness, and that the in-court identification was entirely reliable independent of the photographic and confrontational identification procedures. *Neil v. Biggers,* 409 U.S. 188 (1972); *Foster v. State,* 272 Md. 273 (1974); *Dobson v. State,* 24 Md. App. 644 (1975).

## II. *The Jailhouse Informant*

Appellant contends that the testimony of the "jailhouse informant," Larry Eley, should have been suppressed under the authority of *United States v. Henry,* 447 U.S. 264 (1980), which prohibits the use of incriminating statements deliberately elicited, by an undercover police agent or paid informant posing as a fellow prisoner, from one already charged with crime.

The defect in this contention is that there was no evidence to support the proposition that Eley was "acting on behalf of the Harford County Sheriff's Department" when he was conversing with appellant or that he "deliberately elicited" the incriminating statements from appellant.

There was no error in admitting Eley's testimony. Its weight, if any, considering Eley's criminal record and arguable motivation for lying to ease his own plight, was for the jury to determine.

### III. *Motion for New Trial*

Lastly, appellant contends that the denial of his motion for a new trial was an abuse of discretion. At the hearing on the motion he presented evidence, discovered after the trial, that Larry Eley, the fellow prisoner at the Detention Center who had testified as to incriminating statements allegedly made by appellant, was suffering from a mental illness of such severity at the time of his testimony and at the time the incriminating statements were allegedly made to him as to have prevented him from understanding his oath as a witness and from accurately recalling the events he related to the jury. Testifying for appellant at the hearing was a psychologist who had examined Eley's psychiatric and psychological history, which showed early diagnoses of schizophrenia and psychosis, and concluded that Eley was a thoroughly unreliable witness, suffering from hallucinations and unlikely to be concerned about the truth. The grant or denial of a motion for a new trial lies within the sound discretion of the trial judge, and his ruling on such motion will not be disturbed on appeal except under the most extraordinary and compelling reasons. *Jones v. State,* 16 Md. App. 472 (1973). With respect to newly discovered evidence:

> "There must ordinarily be present and concur five verities, to wit: (a) The evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal."

*Id.* at 477.

The trial judge denied appellant's motion for new trial because part (e) of the above test was not satisfied. Appellant argues that in so doing the trial judge abused his discretion. We reject that argument. This is not a case of discovery of evidence which would tend to establish the innocence of the accused; it is merely a contention that because of a newly discovered infirmity in it, incriminating evidence adduced at trial should not be admissible in the event of a new trial. In view of the victim's testimony describing the incident and making a positive and dramatic identification of appellant as the assailant, as well as the other evidence supporting that identification, we are not persuaded that a new trial eliminating Eley's testimony would be likely to result in an acquittal.

*Judgment affirmed.*
*Costs to be paid by appellant.*