**Frederick CLAY, Petitioner, Appellant,**

v.

**George VOSE, Respondent, Appellee.**

**No. 85–1088.**

United States Court of Appeals,
First Circuit.

Argued June 7, 1985.

Decided Aug. 23, 1985.

Thomas G. Shapiro, Boston, Mass., with whom Shapiro & Grace, Boston, Mass., was on brief for petitioner, appellant.

Frances L. Robinson, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Frederick W. Riley, Asst. Atty. Gen., Chief, Criminal Bureau, and Barbara A.H. Smith, Asst. Atty. Gen., Chief, Criminal Appellate Div., Boston, Mass., were on brief for respondent, appellee.

Before CAMPBELL, Chief Judge, RUBIN * and BREYER, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge.

The introduction of identification testimony from a previously hypnotized witness who had given a prehypnosis identification to the police and who was subject to in-court cross-examination before a carefully instructed jury who also heard testimony concerning the potential inaccuracies of hypnotically induced testimony did not violate the defendant's sixth amendment right to confront the witness. We, therefore, affirm the district court's decision, 599 F.Supp. 1505, to deny the petition for writ of habeas corpus of a person convicted of a state offense after the admission of such testimony against him.

I.

Jeffrey Boyajian, a cab driver, was shot and killed in November, 1979. The police found his body near his cab in front of the Archdale Housing Project in downtown Boston.

On the night of the murder, Richard Dwyer, another taxi driver, had parked his cab behind Boyajian's taxi in front of the Pilgrim Theatre. Dwyer saw three black men cross the street and approach the cabs. The three first headed for Dwyer's cab, but he did not like their looks and turned on his meter to indicate that he was

---

* Of the Fifth Circuit, sitting by designation.

busy. He then observed them entering the cab in front of him. One of the men, later identified as James Watson, walked in front of Dwyer's cab and looked Dwyer directly in the eye before entering the taxi. Dwyer watched the three men for no more than thirty seconds, and did not attach any particular significance to his observations at the time.

The next day, however, Dwyer read an account of Boyajian's murder in the newspaper. He telephoned the police, went to a police station, and gave a somewhat vague description of the men whom he had seen the night before. The police asked Dwyer if he would be willing to undergo hypnosis to improve his memory of the men, and Dwyer agreed. Before being hypnotized, Dwyer examined a group of twelve photographs. He made a positive identification of Watson, and also picked out a picture of Clay whom he tentatively identified as one of the other men he had seen enter Boyajian's cab shortly before the time of the murder. At trial, there was conflicting testimony concerning the degree of confidence Dwyer expressed in his identification. The police said he had been "80% certain," but Dwyer testified to a lesser degree of certainty. Dwyer also picked out a third photo that he "liked," but could not provide a positive identification of the third man.

After Dwyer had examined the photographs, Detective Brady, the hypnotist, explained to Dwyer that, under hypnosis, he would see "a documentary of what had taken place," "that the hypnosis would make it clear in [his] mind what [he] had seen the previous evening," and that Dwyer "would be able to see [the events] in his mind just as if he were watching T.V." (There was later testimony that this account of the mental processes of a person under hypnosis is incorrect and, because it is misleading, unduly suggestive as well.) Three Assistant District Attorneys also attended the hypnosis session, as did three police detectives. The police also made an audio recording of the session. Dwyer did not make any identifications while under hypnosis.

Immediately after Detective Brady had hypnotized him, had instructed him to review the events, and had returned Dwyer to consciousness, Dwyer examined the same photo array he had seen before the session. He reiterated his identification of Watson, and was now positive that Clay's photograph was that of one of the men he had seen the night of the murder. He remained unable to identify the third man. Eleven days later, Dwyer underwent hypnosis a second time. After this second session, Dwyer viewed the same photographs again, and repeated his identification of Watson and Clay, but was unable to identify the third man. The police made an audio recording of this session as well.

At trial, the court admitted into evidence the fact of Dwyer's pretrial identification of the photographs of Watson and Clay, including the change in his professed confidence in his identification of Clay after hypnosis. In addition, Dwyer took the stand and identified both defendants in the courtroom.

The jury also heard extensive testimony concerning the hypnotic sessions, including a tape recording of each session. They heard conflicting expert testimony from Dr. Martin Reiser, who testified for the Commonwealth, and from Dr. Martin Orne, Clay's expert. Dr. Reiser testified that he approved of the technique that Detective Brady had used to induce hypnosis, and that, in his opinion, hypnosis was not highly significant in the instant case. Dr. Orne, on the other hand, criticized Detective Brady's technique in conducting the sessions. He also gave his opinion that the hypnotic procedures used in this case profoundly increased Dwyer's conviction about what he was saying without necessarily increasing the accuracy of the statements.

Dwyer's testimony was not the only evidence adduced at trial. The Commonwealth introduced Neal Sweatt, a resident of the Archdale Project. Sweatt testified that he saw Watson, Clay, and a third man pull Boyajian from his cab, beat him, and rifle through his pockets. Sweatt also said that he saw Clay point an arm in the driv-

er's direction, heard at least three shots, then saw the three men run away together. Sweatt identified Watson and Clay from a police photographic array, and again in court. Parts of Sweatt's testimony, but not the identifications, were corroborated by Sweatt's mother and by one of Sweatt's friends, both of whom viewed the incident from the parlor window in Sweatt's apartment.

In defense, Clay called his foster mother who testified that, on the evening of the murder, Clay was in the foster home, and remained there until 8 o'clock the next morning. She further stated that Clay could not have left her home during the evening because she was the only person who had a key to open the door to her home. Clay himself took the stand and also testified that he was in his foster home the night of the murder. Several rebuttal and surrebuttal witnesses then testified concerning Clay's alibi defense.

At the conclusion of the evidence, the trial judge instructed the jury that they could not consider the statements made by Dwyer while under hypnosis as evidence. He further instructed the jurors that the tapes of the hypnosis sessions were to be considered "solely for the purpose of deciding whether any identification made by Dwyer was the product of his own recollection and not one that was suggested to him either deliberately or inadvertently." He also cautioned the jury to consider the experts' testimony as to the effect of hypnosis on memory, and specifically on Dwyer's memory. Finally, the trial judge told the jury, "[i]f you should find, based upon all of the evidence that you heard, that his recollection was his own; then you may use it for whatever other purpose that you might have in connection with evaluation of his testimony. If you are satisfied that it was not his own recollection beyond a reasonable doubt; then you should, of course, reject it, and reject it in its entirety."

The jury found Clay and Watson guilty of first degree murder, and the Supreme Judicial Court of Massachusetts affirmed the conviction on appeal.[1] Clay then filed a petition for writ of habeas corpus in the federal district court, and, after the court denied the petition, this appeal followed.

## II.

Clay argues that the potential for effective cross-examination of a witness is destroyed by the process of hypnosis because hypnosis causes a witness to develop an unshakable confidence in the accuracy of his posthypnotic perception. Clay claims that Dwyer reacted to his hypnotic experience in exactly this manner. First, any doubt he may have had about the accuracy of his identification of Clay evaporated immediately after his first hypnosis. Second, despite the increased certainty of his posthypnotic recollection, Dwyer attributed his positive identification to his original observation. Finally, Clay claims, Dwyer's increased confidence in the accuracy of his perception altered his demeanor as a witness. Clay contends, therefore, that his counsel was unable to cross-examine Dwyer effectively as to his prehypnosis uncertainty in identifying Clay.

Clay's argument finds support in the numerous state cases that have noted the likelihood that hypnotic subjects will show increased confidence in the truth of their recollections under hypnosis regardless of whether such recollections are accurate.[2] This increased confidence makes it difficult for a jury to determine the credibility of the witness.[3] Moreover, the witness's honestly held belief in the accuracy of his

**1.** *Commonwealth v. Watson,* 388 Mass. 536, 447 N.E.2d 1182 (1983).

**2.** *See, e.g., Commonwealth v. Kater,* 388 Mass. 519, 528, 447 N.E.2d 1190, 1197 (1983); *People v. Shirley,* 31 Cal.3d 18, 65, 181 Cal.Rptr. 243, 272, 641 P.2d 775, 803, *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 105, 436 A.2d 170, 174 (1981); *State v. Mena,* 128 Ariz. 226, 230, 624 P.2d 1274, 1278 (1981); *State v. Mack,* 292 N.W.2d 764, 769 (Minn.1980).

**3.** *State v. Hurd,* 86 N.J. 525, 540, 432 A.2d 86, 93–94 (1981); *People v. Gonzales,* 108 Mich.App. 145, 160, 310 N.W.2d 306, 313–14 (1981), *aff'd,* 415 Mich. 615, 329 N.W.2d 743 (1982).

**4**

post-hypnotic recollections makes efforts to question any prehypnotic doubts or discrepancies equally difficult.[4] As the Fifth Circuit has noted, a witness, after hypnosis,

> may have an unshakable subjective conviction that gives his account on the witness stand the imprimatur of absolute confidence. Indeed, in a criminal trial, the witness's resultant undue confidence might violate the defendant's constitutional right to confront and cross-examine adverse witnesses, for an absolute conviction in the accuracy of his memory might make it "impossible to cross-examine [the] witness in any meaningful way."[5]

That Dwyer's hypnosis might have increased his confidence in his identification of Clay and made it more difficult for Clay's counsel to question him effectively does not necessarily mean that the admission of Dwyer's testimony violated Clay's sixth amendment right to confrontation. The confrontation clause provides "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."[6] As construed by the Supreme Court, "a primary interest secured by [the clause] is the right of cross-examination."[7] The Court has also stated that the two purposes served by cross-examination are to allow the defendant to impeach a witness's credibility and to expose a witness's biases and possible motives for testifying.[8] Fulfillment of these two purposes is so central to the meaning of the confrontation clause that the Ninth Circuit has held that "once cross-examination reveals sufficient information to appraise the witness's veracity, confrontation demands are satisfied."[9]

In this case, Clay was sufficiently able to cross-examine Dwyer to assure him the safety that the sixth amendment provides. First, Dwyer was available at trial. He testified before the jury and was cross-examined, and there is no allegation that Dwyer was uncooperative or unresponsive to such questioning. That Dwyer's subjective belief in the accuracy of his testimony might have been increased by hypnosis does not negate the fact that Clay's attorney was able to question the witness fully and extensively. Counsel for Clay could probe Dwyer's testimony for inconsistencies, attack Dwyer's credibility, and portray Dwyer's demeanor in front of the jury as being artificial and solely the product of hypnosis.

Second, the fact that Dwyer had been hypnotized was placed squarely before the jury, the tapes of the sessions were introduced, and in addition, two experts offered substantial evidence as to the possible effects hypnosis might have had on Dwyer's testimony and recollections. This evidence further enabled the jury to assess the credibility of the witness, and to evaluate the accuracy of his assertions.

Next, hypnosis produced only a limited change in Dwyer's testimony. Before undergoing hypnosis, Dwyer had some confidence in his identification of Clay. After hypnosis, Dwyer's degree of confidence increased to 100%: he was then positive that Clay was one of the men he had seen enter Boyajian's cab the night of the murder. This is not a case, therefore, involving testimony from a hypnotized witness as to matters not remembered before hypnosis. Instead, the effect of hypnosis in this case was simply to increase the level of assuredness Dwyer had in his own prehypnotic

---

4. *See State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 188, 644 P.2d 1266, 1274 (1982).

5. *United States v. Valdez,* 722 F.2d 1196, 1202 (5th Cir.1984), *quoting State v. Mack,* 292 N.W.2d 764, 769 (Minn.1980).

6. U.S. Const. amend. VI.

7. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), *quoting Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074,

1076, 13 L.Ed.2d 934 (1965). *See United States v. Jarabek,* 726 F.2d 889, 902 (1st Cir.1984).

8. *Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. at 1110. *Accord Niziolek v. Ashe,* 694 F.2d 282, 289 (1st Cir.1982); *United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982).

9. *United States v. Falsia,* 724 F.2d 1339, 1343 (9th Cir.1983); *United States v. DeLuca,* 692 F.2d 1277, 1282 (9th Cir.1982).

recollection.[10] As the Supreme Court recently observed in considering the argument that the right of confrontation was violated by the government's failure to produce evidence that might be useful in impeaching a witness, admitting this testimony "does not involve any direct restriction on the scope of cross-examination." [11]

Finally, we note the extensive instructions given the jury by the trial judge on the issue of hypnosis. The judge explicitly told the jury not to consider Dwyer's comments made while under hypnosis as evidence, and to evaluate the experts' testimony on the effect of hypnosis on memory. Most importantly, the judge told the jury only to use Dwyer's testimony if they were satisfied that his identification of Clay was a product of his own recollection and not the result of a hypnotically-induced suggestion.

Without determining the precise limits that federal constitutional constraints place on the admissibility of testimony of a previously hypnotized witness, we hold that, under the circumstances of this case, Dwyer's right to confront and cross-examine Dwyer was not violated. Admission of Dwyer's testimony did not so impair Clay's right to cross-examination that the right to confront Dwyer was effectively denied. Finding no merit in Clay's other allegations of error, the decision of the district court denying Clay's petition for writ of habeas corpus is AFFIRMED.

**10.** *See Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190 (1983).

**11.** *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).