**Joan S. BORAWICK, Plaintiff–Appellant,**

v.

**Morrie SHAY and Christine Shay, Defendants–Appellees.**

No. 690, Docket 94–7584.

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1994.

Decided Oct. 17, 1995.

Helen L. McGonigle, Brookfield, CT, for Plaintiff–Appellant.

Charles W. Fleischmann, Bridgeport, CT (Gulash & Fleischmann, Bridgeport, CT), for Defendants–Appellees.

Before: VAN GRAAFEILAND, WALKER, and CABRANES, Circuit Judges.

WALKER, Circuit Judge:

This case presents an issue of first impression: the circumstances under which an alleged victim of sexual abuse may testify as to memories of abuse following therapeutic hypnosis. Plaintiff-appellant, Joan S. Borawick, appeals from a final judgment entered on May 10, 1994 by the United States District Court for the District of Connecticut (T.F. Gilroy Daly, *District Judge*), adopting the recommendations of Magistrate Judge Joan G. Margolis and entering summary judgment in favor of defendants, Morrie and Christine Shay, whom Borawick accused of sexually abusing her as a child. This judgment for defendants followed an in limine ruling prohibiting the plaintiff from testifying based on hypnotically-refreshed recollections of sexual abuse. *Borawick v. Shay*, 842 F.Supp. 1501, 1508 (D.Conn.1994).

## BACKGROUND

Borawick, who is currently thirty-eight years old and a citizen of California, brought a diversity tort action alleging that her aunt and uncle, Christine and Morrie Shay, Connecticut citizens, sexually abused her in the summers of 1961 and 1964, when she visited them at their home at the ages of four and seven, respectively. At the time, she lived in Seattle. Borawick had no memory of the alleged abuse for more than twenty years.

During the fall of 1984, Borawick began to experience panic attacks. When they continued, in the winter of 1985, she sought and received treatment on five or six occasions with a psychiatrist, Dr. Irwin Ruben. From April, 1986 through July, 1987, Dr. Anthony Reading, a clinical psychologist, continued the treatment. In the spring of 1987, she also sought medical treatment for chronic physical illness with Dr. Ronald Peters, a medical doctor and part owner of the Pacific Medical Center ("PMC") in Santa Monica, California. PMC's clientele was largely composed of people from the entertainment industry.

After reviewing Borawick's medical history of chronic illness, Dr. Peters referred Borawick to Valerian St. Regis, a hypnotist who worked under Peters's supervision, since "problems in childhood" sometimes cause chronic illness and are susceptible to recall through hypnosis. Borawick underwent twelve to fourteen hypnotic sessions with St. Regis from the summer of 1987 through the fall of 1988. Before and immediately following these sessions, she had no recollection of

abuse, much less of any abuse by these defendants.

When deposed in 1993, St. Regis testified that he had no permanent records relating to the hypnosis of Borawick; however, prior to his deposition, he had read a portion of Borawick's deposition. St. Regis maintained that, before hypnotizing Borawick, he had no expectation of the type of information that the hypnosis would reveal. He explained that he used "regression therapy" to take Borawick back to the age of between three and five years old. St. Regis also testified that, in general, instead of using hypnotic suggestion with Borawick, he asked broad questions such as "what happened?," "what do you remember?," or "what do you recall?."

St. Regis testified that Borawick revealed under hypnosis that her aunt, defendant Christine Shay, persuaded Borawick, at age four, to strip and engage in "ritual dancing." St. Regis further stated that during hypnosis Borawick described anal object penetration by Christine Shay, as well as another incident in which her aunt inserted a "cap pistol in [Borawick's] vagina." St. Regis also testified that during hypnotic sessions, Borawick disclosed that her uncle, defendant Morrie Shay, anally raped her. St. Regis did not know whether the alleged anal rape involved penile insertion or object insertion.

St. Regis testified that he did not reveal to Borawick what she had described during the sessions, because, in his opinion, such revelations would have been "devastating" and would probably surface in time. Borawick attended her last session with St. Regis in the fall of 1988.

Borawick testified in her deposition that during the second week of February, 1989, several months after her final hypnotic session, she experienced her first non-hypnotic memory of sexual abuse by her father, who is not a defendant in this case. Following this initial recollection, according to Borawick, subsequent memories surfaced in "bits and pieces." Her first memory concerning defendant Christine Shay allegedly occurred on February 10, 1989. On that date, Borawick first recalled her aunt vaginally raping her with a pistol. In late 1990 or early 1991, she first remembered an incident when Christine

Shay forced "a broomstick into [Borawick's] vagina." Borawick also stated that she regained memory of being naked in the presence of her aunt and "having to dance around."

Borawick testified that her memory of being anally raped by defendant Morrie Shay surfaced in 1990. In addition to recalling sexual abuse by her father, aunt, and uncle, Borawick also claims sexual abuse by numerous others, including family members and her father's friends. More detailed references to these individuals and their various "rituals" and other alleged abusive conduct are described in the sealed portion of the appendix.

On January 24, 1992, Borawick commenced this action, seeking compensatory and punitive damages from Morrie Shay and Christine Shay for their alleged willful, wanton, and malicious sexual exploitation of her in 1961 and 1964. *Borawick*, 842 F.Supp. at 1501. Judge Daly denied plaintiff's motion to enlarge time for discovery on July 23, 1992. On November 4, 1992, defendants filed a motion in limine seeking to exclude the plaintiff's testimony. The in limine motion was referred to Magistrate Judge Joan Glazer Margolis. Borawick's second motion to enlarge time for discovery, filed on February 10, 1993, was not ruled upon.

After an initial ruling on March 24, 1993 that set forth the test the magistrate judge would follow in deciding the in limine motion and after receiving further written submissions, the magistrate judge issued a supplemental ruling on May 26, 1993. The ruling recommended granting the defendants' motion in limine to exclude Borawick's testimony, principally on the ground that St. Regis was "not appropriately qualified." *Borawick*, 842 F.Supp. at 1508.

While Borawick's objections to the magistrate judge's initial and supplemental ruling were pending before the district judge, the United States Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, the plaintiff moved for reconsideration of the in limine rulings on the ground that the therapeutic use of hyp-

nosis and her resultant testimony satisfied *Daubert.* Borawick submitted as additional evidence copies of two letters purportedly received from her younger sister in 1989. Both referenced sexual assault against the sister, and one expressly identified the defendants as the perpetrators. Borawick also submitted two expert affidavits, one from a board-certified psychiatrist, Matthew Klein, M.D., and one from a clinical and forensic psychologist, Anne Pratt, M.D., as further support that the therapeutic use of hypnosis is widely accepted in the mental health community and is used for treatment of victims of sexual abuse. The defendants filed a reply and objection to plaintiff's objections, including a letter dated August 1, 1992, also allegedly written by the younger sister, that recanted her earlier allegations. Upon reconsideration, the magistrate judge adhered to her earlier recommended ruling. *Borawick,* 842 F.Supp. at 1509. On January 10, 1994, the district court adopted the magistrate judge's recommendation. *Id.* at 1501.

Shortly thereafter, the defendants moved for summary judgment. After the magistrate judge issued a recommended ruling granting the defendants' motion, the plaintiff refiled and the district court retained and denied a motion by Borawick dated February 10, 1993 to reopen discovery and to enlarge the time for taking depositions. On May 10, 1994, final judgment was entered in favor of the defendants. Borawick appeals from this judgment.[1]

## DISCUSSION

Borawick raises the following claims on appeal: 1) the district court erred in granting the in limine motion because it applied the incorrect legal rule regarding the admissibility of hypnotically-refreshed testimony; 2) the district court's ruling was inconsistent with the holding in *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); 3) the district court violated Borawick's right to a jury trial in granting the in limine motion, which resulted in a summary judgment in favor of the

defendants; 4) the district court deprived her of due process in its rulings on Borawick's numerous motions.

## I. Admissibility of Post–Hypnotic Testimony

This circuit has yet to address the admissibility of post-hypnotic testimony of memories elicited as a result of hypnosis. While numerous state and federal courts have considered this issue, nearly all of them dealt with recall in the context of hypnosis that was specifically intended to enhance a memory of a particular known or suspected occurrence. The parties have not cited, nor are we aware of, any case concerning the specific issue before us: the admissibility of testimony about memories of childhood sexual abuse that are recalled for the first time in adulthood following the use of hypnosis as part of psychotherapy.

### A. *District Court's Approach*

Judge Daly and Magistrate Judge Margolis were highly sensitive to the various concerns surrounding post-hypnotic testimony. The district court recognized that, although most of the caselaw concerns situations in which hypnosis was used to refresh a victim's or witness's memory of a crime or accident, the hypnosis in this case was used for therapeutic as opposed to investigative purposes. *Borawick,* 842 F.Supp. at 1503–05. Giving credence to Borawick's claim that her "psychological injuries caused by childhood sexual abuse are different than for victims of other torts, and that victims of sexual abuse may repress conscious memories of the abuse for years," the district court concluded that hypnosis is appropriate for the type of repression and loss of memory Borawick allegedly experienced. *Id.* at 1505.

Before testimony induced by hypnosis would be admissible, however, the district court determined that certain safeguards were necessary "not only to bolster a plaintiff's legitimate claims for childhood sexual abuse, but also to protect a defendant against

---

**1.** The Record on Appeal includes both an original record from the district court after oral argument and a supplemental record submitted pursuant to a stipulation approved by the district judge.

devastating charges." *Id.* These safeguards were that 1) the hypnotist be appropriately qualified, 2) the hypnotist "avoid adding new elements to the subject's description," 3) "a permanent record be available to ensure against suggestive procedures," and 4) there be "other evidence to corroborate the hypnotically enhanced testimony." *Id.* The linchpin of the district court's ultimate decision to exclude Borawick's testimony was its finding as to the first safeguard: that St. Regis was not qualified.[2] *Id.* at 1509 & n. 5. The district court did not address the third element, but noted that St. Regis was not able to produce the reports that he claimed to have prepared contemporaneously. *Id.* at 1507. The district court suggested, however, that the second safeguard was met in that there was "no indication that St. Regis added new elements to plaintiff's descriptions while under hypnosis." *Id.* at 1508. Given these findings, particularly St. Regis's lack of qualifications, the district court saw no need to decide whether the corroborating evidence Borawick offered satisfied the fourth safeguard. *Id.* at 1508 n. 5. With two of the four safeguards not met, the district court granted the in limine motion to exclude Borawick's testimony of sexual abuse.

### B. *Borawick's Claims*

Borawick first contends that the district court erred in characterizing her recall of sexual abuse as hypnotically refreshed. Rather, she asserts, these memories may have "unfolded on their own" even without therapeutic hypnosis. Based on the timing and nature of the recollections, however, we discern no basis for disturbing the district court's finding that the memories were in fact refreshed by hypnosis.

The gravamen of Borawick's appeal is that even if her testimony were to be construed as post-hypnotic, the district court erred in adopting its legal test in requiring both independent corroborating evidence and a permanent record of the hypnosis. She also argues that the district court clearly erred in concluding that St. Regis was not qualified as a

hypnotist. Instead, Borawick argues, she should be deemed competent to testify under Federal Rule of Evidence 601, which reflects a strong presumption in favor of witness competency, and that this circuit should adopt a rule of per se admissibility of testimony related to memories following the use of hypnosis for therapeutic purposes.

### C. *Standard of Review*

Before turning to the merits of this case, we address the appropriate standard of review. Borawick argues that because the exclusionary rule resulted in her inability to oppose the summary judgment motion, which led to her ultimate defeat on the summary judgment motion, we should review the challenge de novo. The Shays contend that because this is an evidentiary issue, the district court had broad discretion and we should therefore review its decision for abuse of discretion.

■ Our review must be de novo on the question whether, in exercising its discretion to admit evidence, the district court applied the proper legal test. *See A/S Dampskibsselskabet Torm v. Beaumont Oil Ltd.*, 927 F.2d 713, 716 (2d Cir.), *cert. denied*, 502 U.S. 862, 112 S.Ct. 183, 116 L.Ed.2d 144 (1991). We review the district court's finding that St. Regis was unqualified for clear error. *Id.*

### D. *What is Hypnosis?*

While "[t]here is no single, generally accepted theory of hypnosis, [or] consensus about a single definition," Council on Scientific Affairs, "Scientific Status of Refreshing Recollection by the Use of Hypnosis," 253 JAMA 1918, 1919 (1985) [hereinafter, Scientific Affairs], " 'there is considerable consensus at the descriptive level' as to how the [phenomenon] manifests itself in the hypnotized individual," 27 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence § 6011, at 116 (1990) [hereinafter Federal Practice] (quoting Orne, "On the Simulating Subject as a Quasi–Control Group in

---

2. The court initially found the record devoid of any information regarding St. Regis's qualifications and any safeguards he may have used in conducting the hypnosis of Borawick. Borawick was given the opportunity to supplement the record by deposing St. Regis and to offer any corroborating evidence. *Id.* at 1505.

Hypnosis Research, What Why and How," in Hypnosis: Developments in Research and New Perspectives 519–21 (E. Fromm & R.E. Shor eds., 2d ed. 1979)). The American Medical Association has described hypnosis as a

> temporary condition of altered attention in the subject which may be induced by another person and in which a variety of phenomena may appear spontaneously or in response to [verbal] or other stimuli. These phenomena include alterations in consciousness and memory, increased susceptibility to suggestion, and the production in the subject of responses and ideas unfamiliar to him in his usual state of mind.

*People v. Zayas,* 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513, 515–16 (1989) (alteration in original) (quotations omitted).

As early as 1958, the American Medical Association recognized hypnosis as a valid therapeutic technique. Council on Medical Health of the American Medical Association, "Medical Uses of Hypnosis," 168 JAMA 186, 187 (1958). It has been found useful in psychotherapy, in the treatment of psychosomatic illness, to alleviate pain or as a substitute for anesthesia, and for memory recall. *See People v. Hughes,* 59 N.Y.2d 523, 533, 466 N.Y.S.2d 255, 259, 453 N.E.2d 484, 488 (1983); Jacqueline Kanovitz, "Hypnotic Memories and Civil Sexual Abuse Trials," 45 Vand.L.Rev. 1185, 1210 n. 101 (1992). Hypnosis has been credited with restoring lost memories that include repressed memories of painful experiences. Federal Practice, *supra,* § 6011, at 117; *see also* Kanovitz, *supra,* at 1225 & n. 168 (1992). It has sometimes been useful in developing leads in criminal investigations. *See Harker v. Maryland,* 800 F.2d 437, 440 (4th Cir.1986) (noting that "Dr. Martin Orne, a psychiatrist and frequent expert witness, believes that 'hypnosis may be useful in some instances to help bring back forgotten memories following an accident or a crime.'" (quoting Orne, "The Use and Misuse of Hypnosis in Court," 27 Int.J. Clinical & Experimental Hypnosis 311, 317–18 (1979))); *see Hughes,* 59 N.Y.2d at 533, 466 N.Y.S.2d at 259, 453 N.E.2d at 488; Federal Practice, *supra,* § 6011, at 118–19. Despite

these successes, many in the field remain skeptical of the reliability of hypnosis as a technique for refreshing or restoring memory. *Hughes,* 59 N.Y.2d at 533, 466 N.Y.S.2d at 259, 453 N.E.2d at 488 (noting it provides "at best mixed results" in criminal investigations). Empirical studies calling into question the ability of hypnosis to restore memory effectively have engendered "considerable controversy" concerning the validity of using hypnosis for that purpose. Scientific Affairs, *supra,* at 1918. Thus, "[t]he popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation," *Rock v. Arkansas,* 483 U.S. 44, 59, 107 S.Ct. 2704, 2713, 97 L.Ed.2d 37 (1987), and no consensus has been reached regarding the ability of hypnosis to enhance memory, Scientific Affairs, *supra,* at 1918.

The controversy over the effectiveness of hypnosis in memory enhancement centers in large part on disagreements concerning theories of memory. Those scientists who are most optimistic about the role of hypnosis in memory recall conceptualize a process whereby the brain records and stores sensory input accurately, much like a videotape. Recall is the ability to "play back" that tape, and loss of memory is the inability to retrieve that information. *See Little v. Armontrout,* 819 F.2d 1425, 1429 (8th Cir.), *aff'd,* 835 F.2d 1240 (8th Cir.1987) (en banc), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *Harker,* 800 F.2d at 439; *United States v. Valdez,* 722 F.2d 1196, 1200 (5th Cir.1984); Scientific Affairs, *supra,* at 1920. Under this theory, hypnosis simply enhances the retrieval process.

Many scientists reject this theory, however. They view memory recall as "much more complex and much less accurate than previously thought." *State v. Tuttle,* 780 P.2d 1203, 1210 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990); *see* Scientific Affairs, *supra,* at 1920. Instead, they espouse a "construction theory" of memory, which holds that a memory is formed and influenced by numerous factors when the mind creates and integrates the information from an event "into the memory representation of that event." *Valdez,* 722 F.2d at 1200. The composite created by this

process is malleable and evolves over time as additional input is received. In fact, a leading proponent of this theory has written that memory is " 'being continually remade [and] reconstructed in the interest of the present.'" F. Bartlett, Remembering 213 (reprint 1964) (1932), *quoted in Little*, 819 F.2d at 1429.

The "constructivists" are highly skeptical of any view that hypnosis can effectively and accurately enhance memory. They believe that because hypnosis has the power to contribute to memory reconstruction, it can create inaccurate memories. In other words, if present events can contribute to a construction of a memory that differs from that which was originally perceived and if the process of hypnosis is such an event, then hypnosis may distort memory.

The courts have identified several problems with the reliability of hypnotically-refreshed recall. First, a person undergoing hypnosis becomes more susceptible to suggestion. The subject may be influenced by verbal and nonverbal cues, intentionally or unintentionally planted by the hypnotist. This suggestibility may be enhanced by the perception that hypnosis will refresh one's memory and by a wish to please the hypnotist. *See Rock*, 483 U.S. at 59–60, 107 S.Ct. at 2713; *Little*, 819 F.2d at 1429; *Hughes*, 59 N.Y.2d at 534–35, 466 N.Y.S.2d at 260, 453 N.E.2d at 489; *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, 93 (1981).

In addition, a hypnotized person may "confabulate," that is, fill in the gaps in her memory to make it comprehensible. The added details may be derived from irrelevant or unrelated facts or from pure fantasy. *See Rock*, 483 U.S. at 60, 107 S.Ct. at 2713; *Little*, 819 F.2d at 1429–30. Like suggestibility, confabulation can occur as a result of the subject's desire to please the hypnotist by coming up with complete and coherent memories. *See Harker*, 800 F.2d at 440; *Pearson v. State*, 441 N.E.2d 468, 471 (Ind. 1982) (citing Levitt, "The Use of Hypnosis to 'Freshen' the Memory of Witnesses or Victims," *Trial*, April 1981, at 56); *Hughes*, 59 N.Y.2d at 535, 466 N.Y.S.2d at 260, 453 N.E.2d at 489.

A third problem with hypnotically-refreshed recall is "memory hardening," a phenomenon which gives the subject enhanced confidence in the facts remembered, whether they be true or false. *See Rock*, 483 U.S. at 60, 107 S.Ct. at 2713; *Harker*, 800 F.2d at 440; *Hughes*, 59 N.Y.2d at 535, 466 N.Y.S.2d at 260, 453 N.E.2d at 489 (describing experiments that demonstrate this phenomenon). Even as inaccurate recollections increase, the subject's confidence is likely to remain constant or even to increase. In 1985 a leading scientific journal reported that no studies have shown "an increase in accuracy associated with an appropriate increase in confidence in the veracity of recollections." Scientific Affairs, *supra*, at 1921. The lack of correlation between the accuracy of recall and the subject's confidence in the accuracy makes it more difficult for a jury or even an expert to judge the credibility of hypnotically-enhanced testimony, *see Hurd*, 432 A.2d at 93–94, and makes cross-examination difficult, *Rock*, 483 U.S. at 60, 107 S.Ct. at 2713.

Finally, after undergoing hypnosis to refresh memory, individuals may lose the ability to assess their memory critically and be more prone to speculation than if they had relied only on normal memory recall. *Little*, 819 F.2d at 1430–31. The subject becomes less able "to discriminate between accurate and inaccurate recollections." Scientific Affairs, *supra*, at 1921. He or she may also experience "source amnesia," believing that a statement heard prior to hypnosis was a product of his or her own memory. *Little*, 819 F.2d at 1430.

As a result of the foregoing phenomena, the "hypnotically recalled memory is apt to be a mosaic of (1) appropriate actual events, (2) entirely irrelevant actual events, (3) pure fantasy, and (4) fantasized details supplied to make a logical whole." Bernard L. Diamond, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Cal. L.Rev. 313, 335 (1980); *see* Scientific Affairs, *supra*, at 1921. In the worst case, someone who has undergone hypnosis might "inaccurately reconstruct the memory ... and ... then become convinced of the absolute accuracy of the reconstruction through memory hardening." *Harker*, 800 F.2d at 441. The

"constructionist" views, supported as they are in the scientific community, have considerable force. In our view, they cannot easily be discounted when the integrity of the judicial factfinding process is at stake, particularly when no study has shown that hypnosis used to refresh memory increases only accurate recall. Scientific Affairs, *supra*, at 1921.

### E. *Various Approaches to the Admissibility Question*

The state and federal courts that have been faced with the admissibility of hypnotically-refreshed testimony have followed four different approaches. Some courts treat all such testimony as per se admissible under the theory that hypnosis does not render the witness incompetent, but goes to the question of credibility. *See, e.g., Kline v. Ford Motor Co.*, 523 F.2d 1067, 1069 (9th Cir.1975) ("That [a witness's] present memory depends upon refreshment claimed to have been induced under hypnosis goes to the credibility of her testimony not to her competence as a witness."); *United States v. Waksal*, 539 F.Supp. 834, 838 (S.D.Fla.1982), *rev'd on other grounds*, 709 F.2d 653 (11th Cir.1983); *Pearson*, 441 N.E.2d at 473; Federal Practice, *supra*, § 6011, at 123–24. This position depends in considerable part on one's faith in the jury's ability to evaluate the testimony accurately in light of cross-examination, expert testimony relating to hypnosis, and jury instructions. Federal Practice, *supra*, § 6011, at 124. Such an approach was particularly favored when courts were just beginning to address the admissibility of hypnotically-refreshed testimony, *see Tuttle*, 780 P.2d at 1208, but it "has sparsely been followed since 1980," *Zayas*, 137 Ill.Dec. at 571, 546 N.E.2d at 516.

Courts at the other end of the spectrum have found that post-hypnotic testimony is per se inadmissible because the witness is incompetent to testify regarding such matters. *See, e.g., Zayas*, 137 Ill.Dec. at 573, 546 N.E.2d at 518; *Tuttle*, 780 P.2d at 1211; *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 273, 723 P.2d 1354, 1384 *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982). The common thread running through these cases is that the possible distorting effects of hypnosis on memory are impossible to circumvent and are so substantial that "the game is not worth the candle." *Shirley*, 181 Cal.Rptr. at 256, 723 P.2d at 1366. Worse yet, "hypnotism aggravates the unreliability of normal memory." *Valdez*, 722 F.2d at 1200 (referring to finding of California Supreme Court). Reasoning that no safeguard can adequately ensure reliability, these courts deem the evidence inadmissible.[3] *See Shirley*, at 181 Cal.Rptr. at 273, 723 P.2d at 1384. A number of courts apply a modified version of the rule by confirming the witness's testimony to matters recalled before undergoing hypnosis. *See, e.g., Tuttle*, 780 P.2d at 1211; *Hughes*, 59 N.Y.2d at 545, 466 N.Y.S.2d at 266, 453 N.E.2d at 495.

In *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), the Supreme Court reviewed Arkansas's rule that a criminal defendant's hypnotically-refreshed testimony was per se inadmissible. While the Court recognized the problems with hypnosis, it concluded that certain procedural safeguards could reduce the potential inaccuracies of post-hypnotic testimony. *Id.* at 59–60, 107 S.Ct. at 2713. Focusing on the due process right of criminal defendants to testify in their own defense, *id.* at 51, 107 S.Ct. at 2708, the Sixth Amendment right to call witnesses in the defendant's favor, *id.* at 52, 107 S.Ct. at 2709, and the Fifth Amendment guarantee against compelled testimony, *id.* at 52–53, 107 S.Ct. at 2709–10, the Court concluded that the rule of per se inadmissibility was an "arbitrary restriction on the [criminal defendant's] right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections," *id.* at 61, 107 S.Ct. at 2714. Consequently, the

---

3. Many courts have taken this position on the basis that the testimony does not meet the requirements of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), since there is no general acceptance in the scientific community that hypnosis can reliably enhance memory. *See Tuttle*, 780 P.2d at 1209–10; *Hughes*, 59 N.Y.2d at 543, 466 N.Y.S.2d at 265, 453 N.E.2d at 494; Federal

Practice, *supra*, § 6011, at 132–33. This rationale is now called into question with the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, —— U.S. ——, ——, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993), holding that the Federal Rules of Evidence supersede *Frye*. *See* Federal Practice, *supra*, § 6011, at 8 (Supp. 1995).

Court deemed Arkansas's prohibition unconstitutional. The Court, however, explicitly limited the reach of its holding by refusing to express an opinion as to the appropriate rule of admissibility "of testimony of previously hypnotized witnesses other than criminal defendants." *Id.* at 58 n. 15, 107 S.Ct. at 2712 n. 15.

The third and fourth approaches occupy a middle ground. These attempt to balance the competing concerns that animate the per se positions. The third approach, articulated by the New Jersey Supreme Court in the oft-cited *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981), requires adherence to a list of prescribed safeguards intended to ensure the reliability of hypnotically-refreshed testimony. The court concluded that "a rule of per se inadmissibility is unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony." *Id.,* 432 A.2d at 94.

In light of recommendations offered by a frequent expert witness, Dr. Martin Orne, the court adopted the following procedural requirements:

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed....

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense....

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form....

Fourth, before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them [without] ... asking structured questions or adding new details.

Fifth, all contacts between the hypnotist and the subject must be recorded....

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. *Id.,* 432 A.2d at 96–97 (footnote omitted).

The presence of these safeguards, however, was not sufficient in *Hurd* for the admissibility of post-hypnotic testimony. The trial court was also directed to assess the reliability and the admissibility of the testimony in light of the following non-exclusive list of considerations, *id.,* 432 A.2d at 96: "the kind of memory loss that hypnosis was used to restore and the specific technique employed," *id.,* 432 A.2d at 95, whether the memory loss in question is "likely to yield normal recall if hypnosis is properly administered," and "whether the witness has any discernible motivation for not remembering or for 'recalling' a particular version of the events," *id.,* 432 A.2d at 96. Finally, the court held that the party attempting to admit the hypnotically-enhanced testimony bears the burden of demonstrating that the testimony is reliable based on the standards described. *Id.,* 432 A.2d at 97.

Several courts have followed the *Hurd* guidelines or adopted similar ones. *See State v. Weston,* 16 Ohio App.3d 279, 16 O.B.R. 309, 475 N.E.2d 805, 813 (1984); *House v. State,* 445 So.2d 815, 826–27 (Miss. 1984); *see also* Federal Practice, *supra,* § 6011, at 168.

Finally, the approach most frequently taken by the federal courts, Federal Practice, *supra,* § 6011, at 173, is a so-called case-by-case or totality-of-the-circumstances approach, *see, e.g., McQueen v. Garrison,* 814 F.2d 951, 958 (4th Cir.), *cert. denied,* 484 U.S. 944, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987); *Wicker v. McCotter,* 783 F.2d 487, 492–93 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1123 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). While recognizing the benefits of the *Hurd* guidelines, these courts conclude that the district court should be given discretion to balance all of the factors to determine the reliability of the evidence and the probative versus prejudicial effect of the testimony. They note that even though the safeguards required by other courts

represent[ ] the type of general reliability inquiry that must be made[,] . . . a court cannot necessarily rest solely on the reliability *vel non* of the hypnosis procedures in ruling on the admissibility of the proffered testimony. Even though all of the *Hurd* safeguards might be employed, the defendant may still be able to demonstrate by expert testimony that a witness' memory has been irreparably distorted by hypnosis. On the other hand, even if the hypnosis procedures are flawed, a trial or appellate court might discern that a witness' testimony was nonetheless independent of the dangers associated with hypnosis.

*McQueen*, 814 F.2d at 958 (citations omitted). As the foregoing summary indicates, the law continues to be in a state of flux regarding the reception of hypnotically-enhanced testimony. *See* Federal Practice, *supra*, § 6011, at 123.

### F. *Hypnosis as a Therapeutic Tool*

The existing caselaw concerning the admissibility of post-hypnotic testimony, while helpful to our analysis, is grounded in fact situations where the hypnosis is specifically directed to the witness's recollections of known events, rather than where repressed memories of past traumas previously unknown simply emerge following hypnosis. Borawick, relying heavily on a law review article, Kanovitz, *supra*, at 1213, argues that hypnosis functions differently and more reliably when it results in the retrieval of repressed memories of traumatic events than when it is used to refresh one's memory of eye-witnessed events and therefore testimony relating to the former should be admitted on a per se basis.

The research on hypnosis only uses subjects with normal memory function who are exposed to simulations of real-life events to "replicate eyewitness situations," *id.* at 1212, 1223, since for practical and ethical reasons, it is impossible to design effective controlled studies to test the ability of hypnosis to retrieve accurate, suppressed memories of childhood trauma, *id.* at 1221–22. The Kanovitz article sets forth some arguments in support of the view that hypnosis may be better able to retrieve memories "kept out of conscious awareness by ego-defenses that

protect the psyche from trauma," *id.* at 1194, than hypnosis used for normal memory recall. In the clinical setting, hypnosis may overcome the psychological barriers to remembering past traumas because it induces profound relaxation and calmness, intensifies concentration, and focuses the subject's attention inward. *Id.* at 1213. In addition, the clinical literature "abounds with case histories of spectacular memory successes." *Id.* at 1225. Finally, repressed memories of events that have a traumatic impact upon the witness may, even if unconscious, tend to remain fixed and survive longer than memories of events witnessed quickly, in the context of a great deal of other sensory information. *Id.* at 1231–32.

Based on those reasons, the article concludes that courts should be more willing to accept testimony based on retrieval of repressed memories than when hypnosis is used to enhance eyewitness accounts, particularly since failure to admit post-hypnotic testimony in cases like this one might discourage the use of hypnosis in therapy. Therapists might fear that patients who discover they were victimized as children could lose the opportunity for legal redress if their testimony was based on post-hypnotic recall. *See id.* at 1255–56. Noting, however, that clinical hypnosis is not without some risk of memory distortion—for example, clinicians may "over-step[ ] the boundaries of interviewing neutrality" and may be especially interested in their patients' "subjective impressions" of their pasts, rather than accurate recollections, *id.* at 1218—the Kanovitz article suggests that courts should ask "whether hypnosis can create sexual abuse memories in subjects who have never experienced abuse." *Id.* at 1220. Because the "only evidence that hypnosis can implant false autobiographical memories comes from experiments with subjects who are handpicked for their high hypnotizability," *id.* at 1235, a characteristic that can be measured, *id.* at 1238, the article suggests that "high hypnotizability [may be] a factor bearing on admissibility." *Id.* at 1239.

While we appreciate the force of many of these arguments, the fact remains that the literature has not yet conclusively demon-

strated that hypnosis is a consistently effective means to retrieve repressed memories of traumatic, past experiences accurately. For example, the Council on Scientific Affairs has pointed out that the case histories of "spectacular memory successes" are anecdotal and difficult to verify independently and there are no controlled studies confirming these reports. Scientific Affairs, *supra*, at 1919. In addition, some in the clinical community express reservations concerning the theory of memory repression, or at least the phenomenon's prevalence. *See* Julie M. Murray, "Repression, Memory, and Suggestibility," 66 U.Colo.L.Rev. 477, 505–08 (1995). Furthermore, we are highly skeptical of the belief in the clinician's ability to "weed out most patently groundless claims" because childhood sexual abuse often "fits like a tailor-made glove" to certain psychiatric disorders. Kanovitz, *supra*, at 1242. Some therapists may be too eager to find patterns of behavior demonstrative of childhood sexual abuse. *See* Murray, 66 U.Colo.L.Rev. at 507–08. *But cf.* Colette M. Smith, "Recovered Memories of Alleged Sexual Abuse," 18 Seattle Univ.L.Rev. 51, 61 (1994) (noting that Harvard Medical School psychiatrist Judith Herman "believes that therapists rarely wield enough power over patients to impose false memories on them"). Therefore, even though there may be important distinctions between the use of hypnosis to enhance memories of witnessed events and the use of hypnosis to retrieve repressed memories, given the lack of empirical studies as to the latter and the complicated nature of hypnotically-induced recall, we are not willing to assume that the risks of suggestibility, confabulation, and memory hardening are significantly reduced when the hypnosis that triggers the testimony is used for therapeutic purposes.

### G. *Totality-of-the-Circumstances Approach*

■ Based on our review of the literature and the caselaw, we conclude that the district court was correct to reject a per se rule of admissibility or inadmissibility. A per se rule of exclusion or inclusion is too blunt a tool with which to address the concerns regarding the reliability of post-hypnotic testimony or the concerns that people who have been sexually abused may lose an opportunity to bring suit against their abusers.

To be sure, the exclusion of such testimony in every case avoids the problems of unreliability, but it ignores Federal Rule of Evidence 601, which "abolished almost all grounds for witness disqualification based on new assumptions that took a more optimistic view of witness reliability and jury perceptiveness." Federal Practice, *supra*, § 6011, at 124, 129. In addition, we believe that it risks the elimination of reliable testimony. *See State v. Iwakiri*, 106 Idaho 618, 624, 682 P.2d 571, 577 (1984).

On the other hand, to admit all such testimony without pause, even if the jury is informed of the risks of the potential problems of hypnotically-enhanced testimony, creates the danger of having a lay jury speculate as to the effects of the hypnosis in the case before it. As a result, such an approach seems to us inadequate to protect defendants from unfounded charges in either criminal or civil suits. *See* Federal Practice, *supra*, § 6011, at 127–28. While we appreciate the care and sensitivity with which the district court chose its methodology, we nevertheless find its approach too rigid and restrictive and prefer a "totality-of-the-circumstances" approach. First, we believe that to treat the presence or absence of safeguards as the sole criteria of admissibility may not always mitigate the problems associated with hypnotically-refreshed memory, and it may "give hypnosis an aura of reliability which misleads the jury into disregarding the remaining dangers." Federal Practice, *supra*, § 6011, at 169–70.

Second, like the Fourth Circuit, we are reluctant to treat the presence of safeguards as a litmus test for determining the reliability of pre-trial hypnosis, since even though the safeguards are relevant to the inquiry, "a court cannot necessarily rest solely on the reliability *vel non* of the hypnosis procedures in ruling on the admissibility of the proffered testimony." *McQueen*, 814 F.2d at 958. Conversely, the absence of safeguards does not compel the conclusion in every case that post-hypnotic testimony is unreliable:

"[E]ven if the hypnosis procedures are flawed, a trial or appellate court might discern that a witness' testimony was nonetheless independent of the dangers associated with hypnosis." *Id.; see also Iwakiri,* 106 Idaho at 625, 682 P.2d at 578 ("[M]erely because one of the safeguards was not followed should not result in the automatic exclusion of the entire testimony.").

Thus, we believe that the rule of admissibility should be more flexible than the one suggested by the district court and we therefore find preferable the approaches taken by the Eighth Circuit in *Sprynczynatyk,* 771 F.2d at 1112, and the Fourth Circuit in *McQueen,* 814 F.2d at 951. In *Sprynczynatyk,* the Eighth Circuit required pretrial hearings to assess the procedures used in hypnosis to determine "in view of all the circumstances," whether the testimony was sufficiently reliable and whether its probative value outweighed any prejudicial effect. 771 F.2d at 1122.

In *McQueen,* the Fourth Circuit required the trial court to

> conduct a balanced inquiry to determine if the testimony had a basis that was independent of the dangers associated with hypnosis—in other words, a balanced inquiry to determine whether a witness' memory and ability to testify from it was distorted by the earlier hypnosis. The balanced inquiry ... cannot be circumscribed by narrow considerations, and ... must be determined by a detailed factual analysis on a case-by-case basis.

814 F.2d at 958. Despite flawed hypnosis procedures, the Fourth Circuit concluded that the hypnotically-enhanced testimony of a witness to a murder was admissible because "considerable circumstantial evidence corroborated [the] testimony," *id.* at 959, her testimony "exhibited the characteristics normally expected from a witness recalling details of facts five years after their occurrence," and there was "no indication of a memory unshakably frozen by hypnosis," *id.* at 961.

■ In conducting a case-by-case analysis, the district court should consider the following non-exclusive list of factors. First, it should evaluate the purpose of the hypnosis: whether it was to refresh a witness's memory of an accident or crime or whether it was conducted as part of therapy. In the former instance, the subject may feel pressured to remember details, to aid the criminal investigation, whereas when the subject has undergone therapy to explore the sources of her psychological ailments, she may be less inclined to confabulate or describe a complete coherent story. In the latter case, however, the court should be mindful of the possibility that the subject may have received subtle suggestions from her therapist that abuse or other traumas could be at the root of her problems. Thus, a second important consideration is whether the witness received any suggestions from the hypnotist or others prior to or during hypnosis such as a theory of the cause of the subject's ailments or key information relevant to the investigation for which she underwent hypnosis. A third and related factor is the presence or absence of a permanent record, which can help the court ascertain whether suggestive procedures were used. Ideally, the session should be videotaped or audiotaped. Fourth, a court should consider whether the hypnotist was appropriately qualified by training in psychology or psychiatry. A fifth factor is whether corroborating evidence exists to support the reliability of the hypnotically-refreshed memories. Sixth, evidence of the subject's hypnotizability may also be relevant. A highly hypnotizable subject may be more prone to confabulate and more susceptible to suggestion. Seventh, the court should consider any expert evidence offered by the parties as to the reliability of the procedures used in the case. Finally, a pretrial evidentiary hearing is highly desirable to enable the parties to present expert evidence and to test credibility through cross-examination.

■ After consideration of all of the relevant circumstances, the trial court should weigh the factors in favor and against the reliability of the hypnosis procedure in the exercise of its discretion whether to admit the post-hypnotic testimony. Finally, we add that the party attempting to admit the hypnotically-enhanced testimony bears the burden of persuading the district court that the

balance tips in favor of admissibility. *Hurd*, 432 A.2d at 97.

### H. *Application of Admissibility Approach to this Case*

■ While we conclude that the test for admissibility adopted by the district court in this case was insufficiently flexible, and while we believe that it would have been more appropriate for the district judge to have conducted an evidentiary hearing prior to issuing his ruling, we nonetheless affirm the district court's in limine ruling and subsequent summary judgment. Since in our view the factors before the district court weighed decisively against the admissibility of Borawick's testimony, we are convinced that if the district court had followed our test, it would have necessarily reached the same conclusion. We see no point in remanding the case so that the district court can reach the same finding.

First, Borawick's assertions notwithstanding, it is beyond question that St. Regis lacked adequate professional qualifications as a hypnotist. While a panoply of academic qualifications is not necessary in all circumstances for one to qualify as an expert, there should be a general presumption in favor of appropriate academic credentials. The district court's finding that St. Regis was not properly qualified finds ample support in the record: his formal education ended with a high school diploma; he had no formal training in psychiatry or psychotherapy; his hypnotic technique used an experimental cranial electronic stimulator; he did not read the professional literature; and his work experience prior to being a hypnotist at Pacific Medical Center was intermittent. The fact that Dr. Peters, a medical doctor, self-servingly stated that he considered St. Regis to be qualified is not enough to disturb the district court's determination.

There was also no permanent record of the procedures that St. Regis used; no videotapes, audiotapes, or even contemporaneously-drafted medical reports existed. 842 F.Supp. at 1507. As a result, the district court was not provided with any means, independent of St. Regis's testimony, to determine whether or not he was inadvertently suggestive in his approach or otherwise used suspect techniques in conducting the hypnosis. Without such a record, expert testimony would have been of little value, since experts similarly would have had no basis on which to evaluate the actual procedures St. Regis used.

Finally, we receive no comfort from the fact that St. Regis read excerpts from Borawick's deposition transcript prior to testifying himself. Given that he is not qualified and that the record lacks any basis on which to assess the reliability of the procedures he used, this circumstance further undermines the value, if any, of his testimony.

Our conclusion is reinforced by the inherent incredibility of Borawick's allegations. In this case, Borawick has levelled fanciful accusations of sexual abuse against numerous persons other than the defendants in this matter that include persons both familiar and unfamiliar to her. For example, Borawick allegedly recalls being raped and sexually abused at the age of three during rituals by men whom she believed to be members of the Masons. She also purports to recollect several incidents in which she was drugged by injection as well as an incident in which she was forced to drink blood at a ritual involving a dead pig, incense, chanting, and people dressed in black gowns. Several additional incidents of a similarly unlikely nature involving sexual abuse by others are included in the sealed record. That Borawick has made these far-fetched, uncorroborated accusations against others, in addition to the defendants, erodes our confidence in the allegations against Morrie and Christine Shay and properly weighs against the admissibility of her hypnotically-induced memories.

We note that the district court failed to consider the evidence that Borawick offered as corroboration in her motion for reconsideration, including letters from her sister alleging abuse. In the face of the record before the district court, we find that Borawick's corroborating evidence was simply too weak to overcome the very strong evidence against admissibility. Consequently, we affirm the district court's ruling as to the in limine motion.

## II. The Application of *Daubert*

Borawick also contends that the district court's in limine ruling was not consistent with *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in which the Supreme Court held that the test set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), was superseded by the adoption of the Federal Rules of Evidence. *Id.* at ——, 113 S.Ct. at 2793. In determining "the proper standard for the admission of expert testimony," *id.* at ——, 113 S.Ct. at 2792, the Court noted that several of the Federal Rules of Evidence applied. Rather than impose a rigid framework of criteria that must be met in order for the testimony to be admissible, the Court ruled that judges must determine whether an expert's testimony "is scientifically valid" by examining 1) whether the theory had been tested, 2) whether it had been subjected to peer review, 3) what the potential or known rate of error is, 4) what sort of standards control the technique's operation, and 5) whether the theory or technique has generally been accepted. *Id.* at —— — ——, 113 S.Ct. at 2796–97. This inquiry, the Court emphasized, should be flexible. *Id.* at ——, 113 S.Ct. at 2797. In giving trial judges "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *id.* at ——, 113 S.Ct. at 2799, the Court assigned trial judges "a gate-keeping role" for the admissibility of scientific evidence. *Id.* at ——, 113 S.Ct. at 2798.

We do not believe that *Daubert* is directly applicable to the issue here since *Daubert* concerns the admissibility of data derived from scientific techniques or expert opinions. The issue before us is whether Borawick is a competent witness, *see* Federal Practice, *supra,* § 6011, at 125–26, or whether her lay testimony is admissible, *Valdez,* 722 F.2d at 1200–01. Under either characterization, the question does not concern the admissibility of experimental data or expert opinions. *See id. But see Tuttle,* 780 P.2d at 1211 (rejecting the State's position that the issue only concerns the admissibility of testimony from a lay eyewitness as opposed to an expert on the basis that "the hypnotically enhanced testimony given by the witness is the product of scientific intervention").

Even though *Daubert* does not provide direct guidance, our decision today is informed by the principles underlying the Supreme Court's holding. First, by loosening the strictures on scientific evidence set by *Frye, Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test "shaky but admissible" evidence, *Daubert,* —— U.S. at ——, 113 S.Ct. at 2798, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable. Finally, we note that, even if *Daubert* were of direct application, nothing in *Daubert* is inconsistent with our outlined approach.

## CONCLUSION

We have considered the Due Process and Seventh Amendment claims raised by Borawick and conclude that they are meritless. Consequently, for the foregoing reasons we affirm the district court's summary judgment in favor of defendants dismissing the complaint.